IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| NOORANI TRADING, INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 1:17-CV-1344-LMM |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AMIT F. BIJANI, AB | : | |
| INTERNATIONAL, LLC, NAFISA | : | |
| BIJANI, N.F. INTERNATIONAL, | : | |
| INC., and STAR IMPORTERS & | : | |
| WHOLESALERS, INC. | : | |
| | : | |
| Defendants. | : | |

## **ORDER**

This case comes before the Court on Plaintiff Noorani Trading, Inc.'s

("Noorani") Motion for Terminating Sanctions [201]. The Court held a hearing on

this Motion on July 12, 2021, which was attended by Plaintiff and by Defendants

Amit Bijani, Nafisa Bijani, AB International, LLC, and N.F. International, Inc.

("the Bijani Defendants").[1] After due consideration, the Court enters the

following Order:

---

[1] Counsel for Defendant Star Importers and Wholesalers, Inc. voluntarily
chose not to attend.

## I.  BACKGROUND

This case was filed on April 14, 2017, more than four years ago. Since then, the Court has expended much time to address a series of discovery abuses committed by the Bijani Defendants. Defendants have hampered the progress of this case, hamstrung Plaintiff Noorani in its efforts to obtain discovery, and, at times, brazenly lied to this Court. The Court will briefly describe the progress of the underlying case before turning to the string of discovery abuses that have led to this Order.

### A.  Underlying Case History

Plaintiff Noorani is a Georgia corporation that manufactures incense wands and air fresheners. See Dkt. No. [80] ¶¶ 7, 15, 18. It sued in this Court on April 14, 2017, claiming that Defendants infringed its trademark and the trade dress of its incense products. See Dkt. Nos. [1]. Plaintiff claims trademark rights in an oval mark containing the letters BLUNTEFFECTS and trade dress rights in the packaging of its incense, air fresheners, and air freshener display box. Dkt. No. [80] ¶¶ 14, 18, 20, 24. The Bijani Defendants are the manufacturers of incense and air fresheners whose packaging Plaintiff claims infringes its own. Id. ¶ 37. Defendant Star Importers is a wholesaler who purchases products from the Bijani Defendants and sells the products to distributors. Id. ¶ 38. Defendant Star is not a target of the present sanctions Motion.

On the same day Plaintiff filed suit, it sought a temporary restraining order and preliminary injunction. Dkt. No. [2]. The Court granted a preliminary

injunction on Plaintiff's trade dress claim on May 4, 2017. <u>See</u> Dkt Nos. [13], [16]. Defendants then redesigned the packaging of their products. On July 17, 2017, Plaintiff filed a motion to amend the Court's preliminary injunction to include additional trade dress and the modified version of Defendants' enjoined trade dress. Dkt. No. [35]. The Court held a hearing on that motion, and on August 16, 2017 granted the motion as to Defendants' air freshener display trade dress only. Dkt. No. [54].[2]

### B.   Discovery Abuses

As discovery unfolded, the Bijani Defendants repeatedly failed in their discovery obligations. Plaintiff served initial written discovery requests to Defendants on June 15, 2017, Dkt. Nos. [20–24], but Defendants did not serve any documents in response until November 8, 2017. After Defendants filed a Motion to Dismiss on December 15, 2017, Dkt. No. [82], they refused to further participate in discovery until the motion was resolved, though Defendants had already answered the Amended Complaint on August 8, 2017. Dkt. No. [85]; <u>see also</u> LR 26.2(A) (stating that discovery commences 30 days after the first defendant answers). The Court reminded Defendants of their obligation to participate in discovery on January 22, 2018. Dkt. No. [85]. Defendants' early

---

[2] The Bijani Defendants spent much of the hearing arguing that they should not be sanctioned because their products are no longer infringing Plaintiff's trademark. Even if true, this argument misunderstands the nature of the case. Certainly, issues remain concerning past infringement and damages. Whether these Defendants are currently infringing is not the only issue before the Court.

refusal to engage in discovery resulted in delay. Dkt. No. [87]. After that, the Court twice granted stays of discovery before referring the case to a magistrate judge for mediation on July 9, 2018. Dkt. Nos. [91–94]. The parties reached an impasse after two sessions of mediation on October 12, 2018 and January 2, 2019. Dkt. Nos. [98, 99].

After a highly contentious round of briefing, the Court held a hearing on March 8, 2019 to address the unprofessional tone of the briefs and emails exchanged between counsel. Dkt. No. [117]. The Court had to remind counsel of their professional obligations, which included refraining from exchanging personal insults. The Court then allowed Defendants to file an out-of-time answer to the Second Amended Complaint on March 18, 2019. Dkt. No. [118].

From that date, Defendants began a string of discovery abuses that has continued until now. These abuses have continued despite warnings and orders from the Court. First, Plaintiff emailed the Court to protest Defendants' failure to timely supplement its production of documents. Dkt. No. [122]. The Court directed Defendants to produce the requested documents or show cause for their failure to do so. Id.

Several new issues then arose between the parties, which they raised in emails to the Court, and which the Court resolved through a teleconference on May 2, 2019. Dkt. No. [125]. Plaintiff informed the Court that Defendants had failed to appear for deposition, that Defendants had provided inadequate responsive documents and had failed to supplement their interrogatory

responses, and that Defendants had failed to properly verify their interrogatory responses. Dkt. No. [126] at 6. The Court ordered Defendants to provide deposition dates and to provide verifications for their interrogatory responses. Dkt. No. [125].

Because the Court was concerned that Defendants were still withholding documents despite their protestations to the contrary, the Court also directed Defendants to make sure that they had in fact produced the documents that they contended were produced and to file a status update on the docket to "include a statement that Defendants have provided all documents that are in their possession, custody, and control if that is what is determined after a secondary search." Id. Defendants filed a status update on May 10, 2019, signed by counsel, which affirmed pursuant to the Court's order "that, after a secondary search, Defendants have provided to Plaintiff all such documents that are in their possession, custody, and control." Dkt. No. [129]. As the Court describes further below, that affirmation was not true.

The Court held another teleconference on May 22, 2019. Dkt. No. [131]. During that call, Plaintiff raised new discovery-related issues, which required the Court to issue several more directives: (1) that Defendants should provide corrected verifications; (2) that documents Plaintiff sought from the Bijani Defendants' accountant and Bank of America should be produced—the Court allowed Plaintiff to issue a subpoena to that end; and (3) that Plaintiff would be allowed to move for sanctions regarding any document that the Court ordered

Defendants to produce for which Plaintiff had evidence that Defendants had failed to produce. Id. Discovery was extended on June 7, 2019.

### 1.    First Sanctions Motion

Plaintiff deposed Defendants, and several incidents during that process led Plaintiff to move for sanctions. Dkt. No. [149]. Plaintiff moved for sanctions on five grounds: (1) that Defendants had still not properly verified their interrogatories; (2) that Defendants had failed to provide information on their sales from the period running October 27, 2017 to March 19, 2018; (3) that Defendants had failed to provide information on cost of goods sold; (4) that Defendant Star Importers had failed to produce documents until *after* the deposition of its principal;[3] and (5) that Defendants had failed to preserve electronic communications between them and the parties' mutual packaging

---

[3] Defendant Star Importers & Wholesalers failed to produce Plaintiff's requested documents in discovery until after Star's representative, Mr. Hudda, testified in his deposition that he had sent the documents to Plaintiff. Dkt. No. [149-1] at 10–11. Defendants produced the documents the next day, with defense counsel explaining that he misplaced the documents because he works in a shared office space. Dkt. No. [152] at 11. Accordingly, the Court sanctioned Defendants by ordering Mr. Hudda to appear for a second deposition and ordering Star to pay the cost of that deposition. Dkt. No. [162]. Despite Plaintiff's noticing a deposition of Star, Dkt. No. [165], Star failed to appear to be deposed in contravention of the Court's explicit order. Dkt. No. [170]. As of the writing of this Order, Mr. Hudda has still not appeared for a deposition, according to the report of Plaintiff's counsel given during the hearing on the present Motion. Dkt. No. [218] at 38.

supplier, Shenzhen Kindvast, a Chinese firm. <u>See</u> Dkt. No. [162] at 13–27 (Court's Order of December 5, 2019 addressing sanctions).

The Court granted Plaintiff's request for sanctions in part. First, the Court found that Defendants had still—after several orders from this Court—failed to provide proper verifications, so the Court ordered Defendants to provide verifications with the exact language contained in 28 U.S.C. § 1746. <u>Id.</u> at 14.

Next, the Court found that Defendant Bijani spoliated documents containing the missing sales information. <u>Id.</u> at 14–19. In his deposition, Defendant Bijani had admitted that he threw away handwritten records of his company's sales from October 27, 2017 to March 19, 2018, which were apparently the only extant copies of the records. The Court found that this amounted to spoliation because Defendant Bijani had destroyed the records during the pendency of this litigation, even after Plaintiff had propounded its initial discovery. The records were essential to Plaintiff's case because Plaintiff must show infringing sales to prove its trade dress claim. And the Court found that the reckless decision by Defendant Bijani to throw away crucial records showed bad faith. The Court granted Plaintiff's request for an adverse inference instruction regarding the spoliated records. <u>Id.</u> at 28.

The Court also found that the Bijani Defendants had deleted electronically stored information in the form of emails between Defendants and the parties' mutual packaging supplier, Shenzhen Kindvast. <u>Id.</u> at 22–27. Plaintiff had subpoenaed Google—Defendant Amit Bijani had used a Gmail account—and

found that Defendant and Shenzhen Kindvast had exchanged many emails that were not produced. The Court found that the emails should have been preserved because they concerned the trade dress redesign that the Court had ordered when it granted Plaintiff's preliminary request for relief. Litigation was ongoing when the emails were exchanged. And Defendants knew that the information was relevant, both because the Court had ordered the redesign and because it was a key allegation of Plaintiff's case that Defendants had sought out the packaging supplier to copy Plaintiff's trade dress. Dkt. No. [80] ¶ 40. And the Court last found regarding the deleted emails that their deletion would prejudice Plaintiff. The emails contained critical information about the relationship between the Bijani Defendants and the parties' mutual supplier whom the Bijani Defendants sought out shortly before creating trade dress so similar to Plaintiff's that the Court ordered it redesigned. See Dkt. No. [162] at 26 (finding that "Mr. Bijani's deletion of the emails severed a key evidentiary link"). The Court directed the parties to address appropriate sanctions through additional briefing. Id. at 27. The Court ultimately denied Plaintiff's request for an adverse inference instruction on this issue, Dkt. No. [168] at 8–9, but granted Plaintiff's request that Defendants be precluded from submitting evidence regarding their communications with the supplier, Dkt. No. [178].[4]

---

[4] The Court also granted Plaintiff's request for fees associated with the sanctions briefing. Dkt. No. [178] at 14. Defendants disputed the timing and conditions of payment, and the Court issued an additional order directing Defendants to pay the fees. Dkt. No. [181].

## 2.    *Additional Discovery and Forensic Search*

Given Defendants' discovery failures, Plaintiff requested, and the Court granted, an opportunity to forensically image Defendants' devices to search for information that Defendants had not produced that was relevant to the case. Dkt. No. [168]. The Court directed the parties to propose an appropriate protocol for the forensic search, id., and the Court later approved Plaintiff's proposal, Dkt. No. [178]. The Court found that Defendants' misconduct in discovery up to that point plainly justified a forensic search. Dkt. No. [178] at 11–12.

The search involved several steps. The Court's overarching goal in creating a search process was to give Plaintiff the opportunity to discover information that Defendants had withheld from them, but the Court required Plaintiff to "provide Defendants a full opportunity to review the cloned data [produced through the search] before it [wa]s produced to Plaintiff's counsel." Id. at 12. In keeping with that protection, the Court allowed Defendants to "object to the production of nondiscoverable information, including irrelevant information and information that [wa]s protected by attorney-client privilege." Id. (citing Fed. R. Civ. P. 26(b)(1)).

First, the Court ordered Defendants to notify Plaintiff "of any devices, including both cellphones and computers, that they ha[d] used in conducting business relevant to this case." Id. at 17. The Court ordered Defendants to "make those devices available for Plaintiff's counsel or Plaintiff's forensic IT consultant to retrieve." Id. Plaintiff would then return the devices to Defendants within five

days of retrieval and "provide Defendants with a copy of the information that ha[d] been downloaded." Id. at 18.

Next, the Court directed Defendants to file their "specific objections to the production of this information." Id. Defendants were required, if they objected on privilege grounds, to "submit a detailed privilege log as described above." Id.

Finally, the Court directed the parties to raise any dispute over production of information with the Court.

After laying out the protocol for the forensic search, the Court issued the following warning to Defendants:

> If the Court later determines that Defendants have withheld discoverable information during this process, the Court may consider further sanctions against Defendants to include default. Defendants have been given ample opportunity to comply with their discovery obligations in this matter and have repeatedly failed to honor those obligations.

Id. at 14. That warning proved prescient because the forensic search revealed that Defendants had failed to disclose much information and either deliberately or recklessly destroyed critical evidence that should have been made available to Plaintiff.

### 3. Result of Forensic Search, Evidence of Further Abuses, and Motion for Terminating Sanctions

After the forensic search was conducted, Plaintiff contacted the Court to request permission to move for further sanctions. Plaintiff noted that the forensic search had uncovered several serious abuses of discovery, which justified a

further sanctions motion. Dkt. No. [194]. The Court granted Plaintiff leave to move for sanctions. Id.

Plaintiff filed its Motion for Terminating Sanctions now pending before the Court. Dkt. No. [201]. Defendants responded, but they also requested to depose Plaintiff's forensic expert who conducted the search. Dkt. No. [212]. The Court granted Defendants' request, but Defendants later withdrew it and elected not to depose the expert. Dkt. Nos. [213, 214]. The Court scheduled a hearing on Plaintiff's Motion and held that hearing on July 12, 2021. Now that the issue is fully briefed and the parties have been heard, the Motion is ripe for the Court's ruling.

## II.   DISCUSSION

The Court has described the history of discovery abuses leading to the present Motion to emphasize that much of the misconduct described below was carried out *after* the Court had already sanctioned the Bijani Defendants, obtained affirmations of production, and affirmatively ordered disclosures. With that history in mind, the Court turns to the most recent revelations of misconduct.

As previously discussed, additional revelations came from Plaintiff's forensic search of the Bijani Defendants' electronic devices. The search revealed that the Bijani Defendants failed to disclose information they should have disclosed, despite affirming to the Court that "Defendants have provided to Plaintiff all such documents that are in their possession, custody, and control."

Dkt. No. [129]. The search also revealed that Defendants failed to disclose devices that the Court explicitly ordered disclosed. Dkt. No. [178] at 17 ("Defendants must notify Plaintiff . . . of any devices, including both cellphones and computers, that they have used in conducting business relevant to this case."). And the search revealed that many of these devices have been destroyed, lost, or rendered inoperable by Defendants' actions.

Plaintiff argues that the abuses revealed during the forensic search justify terminating sanctions—namely, striking Defendants' answer and imposing default judgment. Dkt. No. [201-1] at 4. Defendants dispute Plaintiff's accusations and attempt to justify their conduct,[5] and they argue against Plaintiff's request for sanctions. Dkt. No. [202]. The Court begins by describing in detail what the forensic search revealed, and then turns to the standard for sanctions, before reaching its decision about whether and what sanctions are appropriate.

---

[5] At various times, counsel for the Bijani Defendants attempted to explain Mr. Bijani's actions by referring to his difficulty in speaking and understanding English. This argument is curious given the Court's observations at the sanctions hearing. During the hearing, defense counsel tried to have Mr. Bijani directly respond to the Court's questions with the Court having to instruct to counsel that it was counsel's obligation to respond. Mr. Bijani and defense counsel were heard loudly conferring at multiple times during the hearing. In addition, at Mr. Bijani's insistence, the Court did allow Mr. Bijani to give his own closing argument at the hearing. The Court noted none of the difficulties counsel previously argued.

### A.    Discovery Abuses Revealed in the Forensic Search

Prior to the forensic search, the Court directed the Bijani Defendants to identify any devices that they had "used in conducting business relevant to this case." Dkt. No. [178]. In response, the Bijani Defendants identified one cellphone and one iMac computer. Dkt. No. [202-4] ("Please be advised that Defendants have[] one computer, and [] one cell telephone[] to produce for the imaging procedure ordered by the Court."). Plaintiff's forensic IT consultant searched these devices and produced a report on July 29, 2020 (the "Forensic Report"). The Forensic Report revealed the following abuses of the discovery process:

#### 1.    *Undisclosed Devices*

First, the Forensic Report revealed that the Bijani Defendants had failed to disclose all devices used to conduct business, contrary to this Court's explicit direction. The examiner noted that the single Apple iPhone that had been produced had a release date of September 20, 2019, long after this litigation began. Dkt. No. [201-4] at 11. The Apple iMac that had been produced had been manufactured in October 2017. Id. at 16. The dates associated with these devices alone suggested that other devices must have been used, since this case was filed on April 14, 2017. Dkt. No. [1].

The Forensic Report noted that at least one Android cellphone had plainly not been disclosed. Dkt. No. [201-4] at 5. This was clear to the examiner because, prior to his search, he had been presented with screenshots of communications between the Bijani Defendants and Shenzhen Kindvast, the Chinese packaging

supplier. But the expert noted that these communications took place on an Android, while the only phone that he had searched was an Apple iPhone, which the Bijani Defendants had produced following the Court's order. Id. And that phone contained data from September 2019 at the earliest, which meant that more than two years' worth of cellphone data relevant to this case had not been produced for the forensic search, including data from the period of the Court-ordered packaging redesign.

After the Forensic Report issued, the Bijani Defendants emailed the Court and filed a declaration of Defendant Amit Bijani, and each of these documents disclosed previously undisclosed devices. Dkt. No. [201-16] at 4 (email from defense counsel); Dkt. No. [202-6] (Declaration of Amit F. Bijani). Defendants explained that they had used an additional four or five cellphones to the one disclosed and a computer "used in early 2017, which broke, and thus had been discarded." Dkt. No. [201-16] (computer); Dkt. No. [202-6] ¶ 19 (describing the five cellphones). In addition to the iPhone that was produced for search, Defendant Bijani disclosed (1) an Android phone left in a restaurant "about 5 years ago," which he contends was not used in business *after* the filing of this case; (2) an Android phone "that on an unknown date was dropped by our children striking the edge of the pool, was broken, fell into the water and was ruined"; (3) a third Android phone "that I had dropped in mid-September of 2019 and was broken"; and (4) "an Android—that was used during the recent period of computer imaging—and has been offered to Noorani's proposed expert witness

for inspection and imaging, but has not been requested to have been produced."
Id. Defendants identified none of these devices despite the Court's order that they
do so. It is also unclear as to whether any of these phones were cloned or backed
up in any way.

When, at the hearing, defense counsel was pressed as to why these devices
were not disclosed, defense counsel replied, "I reported what I was told by the
client, your honor." Dkt. No. [218] at 19. Asked whether Defendants' disclosure of
only two devices "was now proven to be untrue," defense counsel responded, "Do
I admit that my statement was not correct or incomplete? Yes, I do. I told the
other side what I knew." Id.

The record therefore contains evidence and admissions that the Bijani
Defendants withheld the existence of devices "used in conducting business
relevant to this case." Dkt. No. [178]. This withholding is especially problematic
because the devices that Defendants did disclose were practically useless to
Plaintiff for reasons the Court will soon address. Defendants' failure to disclose
devices in direct contravention of a Court order provides ample basis for
sanction, though it is not the only basis discussed in this Order.

## 2.   *Data Loss from Entire Computer*

Next, the Forensic Report revealed that a new operating system had been
installed on the disclosed iMac such that all relevant data was lost. Dkt. No. [201-
4] at 6. This installation took place on May 11, 2020, id. at 16, which was less than
a month after this Court granted Plaintiff's request to forensically search the

15

Bijani Defendants' devices. Dkt. No. [168] (Order of April 15, 2020). The forensic

examiner described the effect of this installation as follows:

> When a new OS is installed over an old OS, on an Apple iMac, the data
> from the previous OS becomes unusable. What I mean by that is the
> data from the previous operating system is no longer able to be
> obtained or examined. . . . [D]ue to this being an Apple computer the
> data is unrecoverable. This is due to several issues dealing with the
> proprietary nature of how an Apple computer uses storage (hard
> drives and fusion drives) and the type of file system used by Apple
> computers.

Dkt. No. [201-4] at 16. Because of this new installation, the examiner noted that,

almost all data that could be searched was no longer available on the iMac: "log

files that determine what applications were installed on the computer, programs

launched on the computer, internet activity, files accessed, as well as a multitude

of other artifacts are no longer available." Id. This meant that it was impossible

for the examiner to recover information relevant to this case from before May 11,

2020. The forensic examiner also noted that the Apple iMac yielded a search for

"Delete your activity – iPhone & iPad." Id. at 14.

    In their email to the Court, the Bijani Defendants admitted to the

installation of this new operating system. Dkt. No. [201-16] at 3–4. They

attempted to justify this new installation by explaining that the laptop had

malfunctioned, so they had delivered it to a computer repair company, which

installed the new operating system. Id. They point to a handwritten note—

"RELOAD OS AND ALL DATA AS IS"—on the face of an unverified invoice from

the computer repair shop. Dkt. No. [201-16] at 13. Defendant Bijani points to this

note in his declaration as evidence that he was faultless for the deletion of all data from the iMac. Dkt. No. [202-6] at 11–12, ¶¶ 25–23.[6] Defendants account for the "Delete your activity" search by explaining that Mr. Bijani's children had installed too many "entertainment materials," such that the Bijanis needed to delete materials from the devices.

The Court first observes that the timing of the installation is highly suspicious. Mere weeks before the data was wiped from the iMac—whether due to the Bijani Defendants' fault or not—the Court had ordered that computer produced for forensic search. And the new operating system was installed not long before Defendants produced the iMac to the forensic examiner without any warning or indication that the data had been lost.

But even if the loss of data was not the Bijani Defendants' *intention*, it was their fault. The Court finds that it was at best sanctionably reckless for the Bijani Defendants to make such substantial changes to a key piece of evidence. The Court had ordered the iMac produced to a forensic specialist in crystal-clear terms mere weeks before the Bijani Defendants made fundamental changes to its operating system and on the eve of the production deadline. This iMac was one of only two devices Defendants were willing to produce for forensic search—since, as the Court has found, Defendants withheld the existence of the rest of their devices. The other device was an iPhone with a data history beginning two years

---

[6] The declaration paragraphs are misnumbered, so the Court has also provided the page numbers where this testimony appears.

after this case was filed. This iMac, then, was the only device Defendants chose to produce which had data that even approximated the timeline of this case. If it malfunctioned, it was their responsibility to disclose that malfunction to the Court and to Plaintiff so that the data could be preserved in whatever way possible. Defendants instead chose to take the computer to a repair shop that installed a new operating system and wiped its data entirely. That was a sanctionably reckless decision, and it provides one of the bases for sanctions administered below.

### 3.    *Discoverable Apps and Information Never Disclosed*

The docketed filings following the present Motion for Sanctions have further revealed that the Bijani Defendants failed to disclose discoverable information, despite their affirmation to the Court that they had produced all relevant information. Dkt. No. [129] (affirming production). These failures came to light because the Bijani Defendants argued that the installation of the new operating system and the failure to produce devices would not prejudice Plaintiff. Dkt. No. [202] at 18–19; see also Dkt. No. [217] at 1–2. This was so, they argued, because all the information Plaintiff might need was still available through applications whose data was backed up on online servers. Dkt. No. [202] at 18–19. In fact, Defendant Amit Bijani emailed defense counsel to inform him that the data was all backed up on the following apps:

QuickBooks online services
Go clover online service
Gmail online service

       Scanner online service
       Messaging apps China apps online services
       Bank of America online app
       Amazon app to buy requires machine for warehouse or pump to
       transfer liquid
       PayPal app
       Ali Baba Wholesale
       Skype app video
       Snap chat app

       Any many many more used for business.

Dkt. No. [202-3] (reproduced verbatim); Dkt. No. [202-6] ¶ 20 (detailing the use of these applications via the affidavit of Defendant Amit Bijani). Defendants have sworn by affidavit that these applications "were and are responsible for carrying-out at least the following important company business functions," Dkt. No. [202-6] ¶ 21:

       Complete cost of goods
       Complete payroll information
       Complete sales information
       Complete supplier information
       Complete customer credit card payment information
       Complete checks from customers
       Complete accounting information
       Complete General Ledgers
       Complete Accountant's back-up files

Id.

       By disclosing the existence of these apps used to conduct business, the Bijani Defendants have confirmed that they failed to produce all information relevant to this lawsuit as the Court ordered them to do, and as they affirmed they had done, in May 2019. Dkt. Nos. [125, 129]. Plaintiff's counsel insisted at

the hearing and in an affidavit that he did not receive discovery from most of the listed apps. Dkt. No. [218] at 27–28 ("I don't think any of these passwords were ever provided. . . . I'm representing to the Court we didn't get any of that. . . . I don't know if it exists."); id. 32 ("He has this list of 13. I think I've marked off seven that I don't think I've received a single document from, and add Zelle to that, and here we are."). Plaintiff's forensic examiner averred that Plaintiff was not given the information necessary to access these apps, and that if it had been, his services would not have been necessary. Dkt. No. [206-3] ¶ 7 ("To my knowledge, data from these cloud based applications, to include select Gmail data, Amazon, PayPal, Ali Baba, and 'many more' was never provided.").

Defendant Amit Bijani stated that "all of the data from these Apps is available online via subpoena[,]" ostensibly implying that Plaintiff ought to subpoena the applications if it wants the documents. Dkt. No. [202-6] ¶ 21. His list of "items that we had produced" plainly omits many of the applications that he elsewhere describes as "responsible for carrying-out [] important company business functions." Id. ¶ 21.

Further, Defense counsel admitted in the sanctions hearing that this information had not been produced. When asked whether Defendants provided this information to Plaintiff, defense counsel answered, "I don't know. . . . I produced what I was given, your Honor. . . . Every single order that his Court has given I've transmitted to my client and I've transmitted to the other side the discovery that's been given to me." Dkt. No. [218] at 14. Defense counsel later

insisted that "the apps that supposedly the Plaintiff didn't get . . . , all those are duplicative of what's in the general ledger." Id. at 35. Defense counsel gave a list of documents that his client "did produce," which included "quickbooks, the sales, cost of goods, the payroll, the sales to customers, payments to customers, the general ledger, the expenses, the tax returns, the financial statements from the accountant, Bank of America statements and the Gmail." Id. at 16.[7] Absent from this list was the portfolio of additional applications that Defendant Amit Bijani listed in his affidavit, and which he described as "responsible for carrying-out . . . important company business functions[.]" Dkt. No. [202-6] ¶ 21.

Defendants even filed a post-hearing brief in which they confirmed that the Bijani Defendants conduct their business using apps whose data is stored online. Dkt. No. [217] at 1–2. Defendants offer this briefing to argue that Plaintiff will not suffer prejudice from their conspicuous failure to produce discoverable evidence. But the real effect of this briefing is to affirm, in plain terms, that Defendants have withheld highly relevant discoverable information in the form of applications used to conduct business. To be sure, Defendants contend that they "made the Passwords to such Apps available to the Plaintiff's forensic expert," Id. at 2. But they offer no evidence whatsoever to support this contention, and it is

---

[7] In fact, as Plaintiff's counsel pointed out in the sanctions hearing, Plaintiff had to subpoena this information from Google, Defendants' accountant, and Bank of America.

contrary to the representations of the expert himself, Dkt. No. [206-3] ¶ 7, and Plaintiff's counsel.

Defendants imply that Plaintiff had access to the applications because they were stored on the iMac produced to Plaintiff. Dkt. No. [217] at 2 n.2 ("In truth, the data from the Apps, as accessed via the Mac computer . . . ."). But Defendants have not shown that the applications were accessible simply because Plaintiff had the password to the iMac. It is unlikely the applications would have been accessible, since applications typically have their own passwords. And this whole discussion assumes that the applications remained on the iMac after it had been completely wiped. That assumption may not be valid, since Plaintiff's examiner noted, among the missing pieces of data, "log files that determine what applications were installed on the computer." Dkt. No. [201-4] at 16.

Defendants belatedly offer to hire a forensic of their own to pull the data from the applications and produce it. But this offer is more than two years late, since Defendants positively affirmed two years ago that, after a secondary search, they had produced all discoverable information. Defendants have now confirmed that that representation was a lie.

Plaintiff contends that these additional applications were never produced, and Defendants have not offered evidence to the contrary. Instead, Defendant Amit Bijani has insited that he produced what he believed was relevant, and defense counsel expressed credence that his client had complied with the Court's order: "I believe that the Defendant had done that and I was assured that that

had happened." Dkt. No. [218] at 23. But the evidence in the record, including Defendants own admissions, confirms that Defendant had *not* done what the Court ordered. That disobedience provides an additional ground for sanctions—an issue to which the Court now turns.

### B.   Standard and Grounds for Sanctions

The Court finds that the Bijani Defendants' conduct justifies sanctions on several grounds. The primary basis for sanctions is Defendants' failure to obey explicit Court orders during discovery. The Forensic Report provides clear evidence of this disobedience. But, as the background section of this Order indicates, the abuses revealed in the Report are only the most recent in a long line of such abuses. While Defendants' disobedience of the Court's orders suffices as a ground sanctions against them, the Court's decision to administer sanctions is bolstered by the bad faith demonstrated throughout this case.

### 1.   *Sanctions Standard*

Rule 37 empowers courts to impose sanctions when a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A); Higgs v. Costa Crociere S.P.A. Co., 969 F.3d 1295, 1304 (11th Cir. 2020). Such sanctions "may include" an adverse inference instruction, excluding evidence, striking pleadings, staying proceedings, dismissing the action in whole or in part, rendering default judgment, and placing a noncompliant party in contempt. Fed. R. Civ. P. 37(b)(2)(A)(i)–(vii). Ordinarily, a finding of willfulness or bad faith is not necessary for a Court to assess sanctions under Rule 37. BankAtlantic v.

<u>Blythe Eastman Paine Webber, Inc.</u>, 12 F.3d 1045, 1049 (11th Cir. 1994). But that rule gives way, and "a finding of willfulness or bad faith failure to comply" is necessary, "in a case where the court imposes the most severe sanction—default or dismissal[.]" <u>Id.</u> Default judgment is proper "when (1) a party's failure to comply with a court order is a result of willfulness or bad faith; and (2) the district court finds that lesser sanctions would not suffice." <u>Lyle v. BASF Chemistry, Inc.</u>, 802 F. App'x 479, 482 (11th Cir. 2020) (per curiam) (unpublished) (citing <u>Malautea v. Suzuki Motor Co.</u>, 987 F.2d 1546, 1542 (11th Cir. 1993)).

### 2.   *Court's Orders to Defendants*

The Court issued two orders pertinent to this Motion for Sanctions, to which Defendants responded, indicating their understanding and assent. First, the Court issued an order after Plaintiff insisted that Defendants had failed to fully disclose relevant information and documents. Dkt. No. [125]. That order, entered on May 2, 2019, directed Defendants file a status update that would "include a statement that Defendants have provided all documents that are in their possession, custody, and control if that is what is determined after a secondary search." Dkt. No. [125]. Accordingly, Defendants filed a status update on May 10, 2019:

> Pursuant to the Court's ORDER of May 2, 2019 (Document 125), the Defendants do hereby state—regarding the specific items listed in Plaintiff's email to the Court—that, after a secondary search, Defendants have provided to Plaintiff all such documents that are in their possession, custody, and control.

Dkt. No. [129].

Second, the Court ordered Defendants, in connection with the forensic search, to notify Plaintiff "of any devices, including both cellphones and computers, that they have used in conducting business relevant to this case." Dkt. No. [178] at 17. In response, the Bijani Defendants identified one cellphone and one laptop computer. Dkt. No. [202-4] ("Please be advised that Defendants have[] one computer, and [] one cell telephone[] to produce for the imaging procedure ordered by the Court.").

### 3.   *Defendants' Sanctionable Conduct*

Defendants disobeyed both of the Court's direct orders, and their representations to the Court in response to those orders were false. Regarding the first order in which the Court directed Defendants to disclose all discoverable documents "in their possession, custody, and control," Defendants admittedly failed to disclose such documents. Only as recently as the present Motion have Defendants disclosed the existence of numerous online applications that "were and are responsible for carrying-out . . . important company business functions[.]" Dkt. No. [202-6] ¶ 21. And they disclosed these applications only to argue that Plaintiff has not been prejudiced by their failure to preserve highly relevant electronic devices, which were either wiped or destroyed. Since Defendants use these applications to conduct important company functions, they knew that the applications contained information relevant to this case.

25

The Bijani Defendants' failure to disclose the applications in the two years since the Court-ordered disclosure shows willfulness and bad faith. Their abuse is even worse because of their affirmative representation made to the Court, filed on the Court's docket, that they had complied with the Court's order. Dkt. No. [129]. Defendants have withheld highly relevant information from Plaintiff in direct contravention of this Court's plain directive. This withholding calls for serious sanctions.

The Bijani Defendants have repeatedly insisted that sanctions based on this withheld data are not justified because Plaintiff will suffer no prejudice. See, e.g., Dkt. No. [217] at 1–2. This is so, they reason, because the discoverable information they failed to produce has always been available on the applications they used to conduct their business. Id.

Even if true,[8] this argument fails to save Defendants from sanctions for at least two reasons. First, it fundamentally misconstrues Defendants' discovery

---

[8] There is strong evidence in the record to suggest that it is not true. Plaintiff's forensic examiner averred that he had never been supplied any usernames or passwords to the applications that Defendants purportedly used to conduct their business. Dkt. No. [206-3] ¶ 7 ("I do not believe that any user name and or passwords to these accounts were provided."). So did Plaintiff's counsel. Dkt. No. [218] at 33 ("They say, well, all the information's out there on the apps and we gave them the password, username and passwords. . . . That was never given to us."). Further, when asked at the hearing whether the cellphones were "backed up," defense counsel replied, "I don't believe they were." Dkt. No. [218] at 17. The Court need not resolve this factual dispute because, regardless of the availability of the applications to the examiner, Defendants failed to disclose this online data despite their affirmative representation to the Court that they had done so.

obligations. The Court ordered Defendants more than two years ago to conduct a secondary search to ensure that they "have provided all documents that are in their possession, custody, and control[.]" Dkt. No. [125]. Even under normal discovery conditions, and in the absence of a direct Order, Plaintiff would be entitled to discovery of these admittedly relevant sources of information. Fed. R. Civ. P. 26(b). But their responsibility to produce the applications for discovery was unmistakable after the Court's direct order. And Defendants even affirmatively stated to the Court in a docketed filing that they had, after a secondary search, produced all relevant information. Dkt. No. [129]. It is disingenuous for Defendants to argue that Plaintiff will suffer no prejudice when Defendants have skirted their discovery obligations for years. Their abuses have plainly damaged Plaintiff's ability to prove its case.

Defendants' argument regarding the absence of prejudice fails for a second reason: the absence of prejudice can in some cases help defendants avoid sanctions for spoliation, but the absence of prejudice does not negate sanctions under Rule 37's willful disobedience provision. See Higgs, 969 F.3d at 1304 ("[Rule] 37(b) empowers a district court to issue sanctions, including providing a jury with adverse instructions, if a party 'fails to obey an order to provide or permit discovery.'" (quoting Fed. R. Civ. P. 37(b)(2)(A))). A Rule 37(b) sanction is a sanction based on disobedience to the Court, and the record is clear that Defendants have disobeyed the Court.

Defendants also willfully disobeyed the second order in which the Court directed Defendants to identify relevant electronic devices. As the Court has discussed, Defendants produced one cellphone and one computer for forensic search. But they affirmed in later filings that there were at least four more cellphones and a computer relevant to this case. They attempt to justify their failure to disclose for various reasons, but each of these reasons fails.

Defendants protest that they did not disclose the devices because they did not think the devices were relevant, since they were broken or lost. Dkt. No. [202-6] ¶ 18. This argument does not excuse Defendants' conduct. The Court ordered Defendants to disclose "any devices, including both cellphones and computers, that they have used in conducting business relevant to this case." Dkt. No. [178] at 17. There was no qualification about the present status of those devices or when they were used. Defendants are not at liberty to pick and choose which devices to produce or withhold when this Court has commanded them, in the plainest possible terms, to disclose *any devices.*

In any case, the devices were lost or broken entirely due to Defendants' sanctionable recklessness. Defendants try to save themselves with various excuses: one phone was dropped and broken; one phone was left in a restaurant; one phone was given to the children who dropped it in the pool. Dkt. No. [202-6] ¶ 19. But these excuses do more to damn Defendants than to save them. Defendants were embroiled in a multimillion-dollar trade-dress lawsuit in federal court. They had a legal obligation to preserve the highly relevant devices that they

28

failed to produce and that they instead dropped, left in a restaurant, or gave to their children beside the pool. Far from saving them, Defendants' excuses for their disobedience of the Court's direct order simply underscore their sanctionable nonchalance demonstrated throughout this case.

Regarding the wiped iMac, Defendants argue that they are not responsible for the loss of data. See also Dkt. No. [218] at 13. The Court has already addressed why this argument fails in the discussion above. Suffice it to say, Defendants are responsible for the loss of data through their own recklessness and bad faith.

In sum, the Court finds that Defendants have withheld and failed to disclose key evidence, including electronic devices and business records kept in online applications. These abuses were willful, done in bad faith, and directly contravened two Court orders with which Defendants affirmed that they had complied.[9] The data withheld as a result of Defendants' disobedience was essential for Plaintiff to prove its case.

---

[9] Given the willfulness and bad faith here, the Court also finds that sanctions are appropriate under its inherent power. Federal courts possess the inherent power to sanction bad-faith conduct in litigation. See Chambers v. NASCO, Inc., 501 U.S. 32 (1991); United States ex rel. Bibby v. Wells Fargo Bank, N.A., No. 1:06−CV−0547−AT, 2015 WL 82037 (N.D. Ga. Jan. 5, 2015) (imposing $1.6 million sanction based upon the inherent authority of the court for violation of a court order). "[W]hen rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." Peer v. Lewis, 606 F.3d 1306, 1315 (11th Cir. 2010) (quoting Shepherd v. Am. Broadcasting Cos., 62 F.3d 1469, 1474 (D.C. Cir. 1995)). In invoking its inherent power, a court must determine that bad faith exists. Chambers, 501 U.S. at 49-50; In re Sunshine Jr. Stores, Inc., 456 F.3d 1291, 1304 (11th Cir. 2006) ("[T]he key to unlocking a court's inherent power is a finding of bad faith."). A party demonstrates bad faith by "delaying or disrupting

### 4.   *Sanction*

The Bijani Defendants' discovery abuses warrant striking their answer and imposing default judgment. The Court fashions this sanction with full awareness that "the severe sanction of dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." Malautea, 987 F.2d at 1542 (citing Navarro v. Cohan, 856 F.2d 141, 142 (11th Cir. 1988)). And the Court acknowledges that "a default judgment sanction requires a willful or bad faith failure to obey a discovery order." Id. (citing Societe Internationale pour Participations Industrielles et Commerciales v. Rogers, 357 U.S. 197, 212 (1958)). The Bijani Defendants' willfulness and bad faith saturate the record of this case. The Court has imposed many provisional sanctions to make the Bijani Defendants comply with their discovery obligations, but they have nevertheless maintained a stubborn, unapologetic pattern of disobedience. The Court will no longer shepherd this case with stop-gap solutions and temporary fixes. The time is ripe for the "last resort" sanction of default judgment.

Accordingly, the Court will **STRIKE** the Bijani Defendants' Answer and **GRANT** Plaintiff's request for default. Plaintiff requests fees associated with its Motion for Sanctions, Dkt. No. [201-1] at 20, and the Court **GRANTS** that

---

the litigation or by hampering enforcement of a court order." Chambers, 501 U.S. at 46; In re Sunshine, 456 F.3d at 1304. The willfulness and bad faith demonstrated by the Bijani Defendants' evasion of the Court's direct orders amply justifies inherent-power sanctions.

request. See Fed. R. Civ. P. 37(b)(2)(C) ("[I]n addition to the orders above, the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.") (emphasis added); Yaffa v. Weidner, 717 F. App'x 878, 886 (11th Cir. 2017) (per curiam) (unpublished) ("Rule 37(b) provides for the payment of 'reasonable expenses, including attorney's fees, caused by the failure' of an attorney or party to cooperate in discovery.").

### III.   CONCLUSION

Based upon the foregoing, Plaintiff's Motion for Terminating Sanctions [201] is **GRANTED**. The Clerk is **DIRECTED** to **STRIKE** the Bijani Defendants' Answer [119] and **ENTER** default as to liability against Defendants Amit F. Bijani, Nafisa Bijani, AB International, LLC, and N.F. International, Inc.

This Order shall not apply to Defendant Star Importers. Plaintiff's liability claims against it proceed.

Plaintiff's request for attorney's fees associated with the Motion [201] is **GRANTED**. Plaintiff is **DIRECTED** to file within **14** days of the entry of this Order an affidavit regarding reasonable fees and an itemized list of billing entries.

**IT IS SO ORDERED** this 22nd day of July, 2021.

Leigh Martin May

31

**Leigh Martin May**
**United States District Judge**